UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

*In re*:                                                   Case Number: 20-10233-7

     SCOTT A. KRIZAN,

               Debtor.

     TRAVIS P. KRIZAN and
     RONALD V. KRIZAN,

               Plaintiffs,

       v.                                           Adversary Number:  20-17

     SCOTT A. KRIZAN,

               Defendant.

## **DECISION**

Plaintiffs Travis Krizan and Ronald Krizan filed a complaint seeking a determination that debts owed by Scott Krizan and others[1] are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2) as having been incurred by false pretenses, misrepresentation, or actual fraud.

After hearing the arguments of counsel, considering all the documentary and testimonial evidence and weighing the credibility of the witnesses, the Court issues this decision constituting the Court's findings of fact and

---

[1] The other debtors include Beverly Krizan and her son Dale. Beverly and Dale are defendants in similar adversary proceedings in their respective bankruptcies.

conclusion of law.[2] For the reasons more fully described below, the Court finds that Travis and Ronald have met their burden of proof that debts owed to each of them by Scott are nondischargeable as set forth below. A separate judgment will be entered pursuant to Rule 9021.

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. §157(b)(2)(I) as it concerns a determination about the dischargeability of a particular debt. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

Scott and his parents, Beverly and Daniel, were dairy farmers. Scott, Beverly, and Daniel defaulted on their note to Farm Credit Services ("FCS"). The note was secured by a mortgage on land owned by Beverly and Daniel. Scott lived at the property with his parents.

A foreclosure was filed. With the aid of his brother Dale, Scott, Beverly, and Daniel engaged in many acts to delay the foreclosure. They:

- Quitclaimed the property to an Otis Williams for no consideration.

- Williams filed a real estate UCC four days later.

- They signed an offer to purchase from Chad and Beverly Webster on May 2, 2013. Scott also signed that offer.

- Ten months later, Beverly and Daniel gave life estates to Scott and Dale by quit claim deeds.

---

[2] This matter was tried in a hearing consolidated for evidence presentation only with the adversaries against the other debtors. The other adversaries are Case Nos. 20-15 and 20-16.

- On March 25, 2014, Otis Williams quitclaimed the property back to Daniel and Beverly. But his UCC security interest was not released or satisfied until June 22, 2015.

- Eventually Dale and Scott quitclaimed their life estate in the property back to Daniel and Beverly.

- Another offer by the Websters was dated March 27, 2014, and was handled through Scott.

Dale discovered the delay tactics of quit claim deeds and life estates from the internet and seminars. He shared the ideas with Scott and his parents. Together they used the tactics against FCS. The efforts slowed but did not stop the foreclosure. A sheriff's sale of the property was scheduled for April 1, 2014.

## PLAINTIFFS' OFFER

It was Scott who first discussed a possible sale to Ronald and Travis. This led to a meeting on March 27, 2014, among Travis, Ronald, Scott, Daniel, and Beverly. The meeting occurred at the home of Scott, Beverly, and Daniel. The location of the meeting is described as a kitchen and dining room separated by an island. Daniel and Ronald were seated at the dining table, Scott and Travis were at the island, and Beverly was in the kitchen.

The terms for the sale to Travis and Ronald were discussed and agreed upon. Travis, Ronald, Beverly, Daniel, and Scott all signed a handwritten offer. Two days later, that offer was replaced with an offer on the more detailed Wisconsin Realtor form. Again, it was signed by Beverly, Daniel, and Scott. The offer said a down payment in the amount of $430,000 would be made. The down payment was the amount needed to pay off the FCS mortgage. The

possibility this was a secondary offer to a prior accepted offer, such as the Webster offer, was marked "n/a."

Travis, Ronald, Beverly, Daniel, and Scott went to FCS on March 28, 2014. Travis and Ronald each paid $215,000 to FCS. The half of the payment from Travis was funds he borrowed. FCS then released and satisfied its mortgage.

Ronald and Travis credibly testified they did not know about the Webster offer when they paid FCS. They very sincerely testified if they had been told about the Webster offer they would not have made the payment without other steps and protections, including taking an assignment of the note and mortgage from FCS. The reasons for this position were explained and are credible. Travis's experience in real estate transactions further supports the credibility of this testimony.

Scott's contradictory testimony that he did tell Travis about the Webster offer before the offer from Travis and Ronald and before the payment to FCS was incredible. Once confronted with information about the existence of the Webster offer, Scott said he thought the Webster offer was invalid.

Scott's claim that Travis was aware of the Webster offer is contradicted by Scott himself. Scott was served with a *lis pendens* on April 6. Scott admitted that he talked to his parents about the Webster lawsuit and that they responded they wanted to proceed with a sale to Travis. This discussion could not have occurred until the day before the closing. Yet Travis and Ronald

testified believably that they did not know of it, and Scott agreed he did not mention the *lis pendens* until the title agent raised it.

The title work for a closing was prepared. Ronald, Travis, Beverly, Daniel, and Scott attended the closing. Scott, Daniel, and Beverly all signed the documents and acted as if there was no Webster offer. It was only after the documents were signed and the title agent conducted a quick update of the title search that the Webster *lis pendens* was disclosed. It had been served on Scott the day before. Consistent with the testimony of Ronald and Travis, the reaction of Scott, Daniel, and Beverly was to maintain the Webster offer was not enforceable.

Ronald and Travis testified they were told the Webster *lis pendens* was a mistake and that the Webster offer had never been delivered. They say this was the first time they were told anything about another offer. This view was reinforced by the uncontradicted statements made at closing by either Scott or Daniel that the Webster offer was not valid. Scott further conceded that he spoke with Chad Webster near the time of the offer from Ronald and Travis. He claims he assumed that because there was another offer drafted by Chad it somehow meant the prior offer was no longer valid or being pursued. Yet he didn't tell Chad of the interest of Ronald and Travis or mention his discussions with Chad to them.

Scott and his parents submitted an answer in a declaratory judgment action the Websters brought to enforce their offer. The answer said:

> . . . deny that they have entered into a written Offer to Purchase with the Plaintiff's [Webster] which was identified in Exhibit A dated May

5

2, 2013, upon information and belief of the Defendants, the Offer to Purchase may have been signed but was never delivered and was in the house of the Krizan's . . . and was never delivered to the Plaintiffs but the Plaintiff came upon the premises, entered the premises and upon deceit and misrepresentation obtained a copy of the Offer to Purchase. The Defendants never intended to release that signed Offer to Purchase to the Plaintiffs and is unknown other than upon information and belief as to how the Plaintiff's obtained the original document from the household of the Defendants.

Adv. No. 20-15, ECF No. 37, Exh. 39 at 1.

A few days later, an amended answer was filed by Scott and his parents. The only change to the above portion of the answer was the addition of the phrase "upon information and belief" to the claim the Websters "came upon the premises." Both the answer and the amended answer filed shortly after were filled with claims that the Webster offer was not valid, that the Websters purloined the offer, there was no closing date, and that no action was taken by Scott or his parents to close with the Websters.

In an about-face, the position of Scott and his parents changed about ten months later. After being deposed in February 2015, they admitted that the Webster offer had been delivered to the Websters by Scott. No explanation was provided for this change of position other than the claim by Scott that (1) the Websters hadn't scheduled a closing, (2) the Websters prepared a new offer, and (3) the Websters said if the new offer was not accepted they would simply bid at the sheriff sale.

Scott claimed this led him to believe the accepted Webster offer was no longer good. He also asserted, unconvincingly and incredibly, that he had told Ronald and Travis about the Webster offer before Ronald and Travis made their

offer. This testimony was not believable. None of this explained the failure of Scott to disclose the Webster offer to Plaintiffs before the offers were signed or any payment was made to FCS.

Ronald and Travis intervened in the state court action. Their testimony that they believed the Webster offer was invalid was credible and supports their action of intervening.

A state court decision was issued finding the Websters had the primary offer. Appeals ensued. Ultimately there was a sale to the Websters. The circuit court and state court of appeals found Travis and Ronald were entitled to repayment from the Webster closing of the amount they paid to FCS. The appeals court declined to award interest but remanded the matter to the circuit court for further proceedings on the claims of Ronald and Travis against Beverly, Daniel, Scott, and Dale.

On August 28, 2017, Ronald and Travis finally received $430,000.

## Loans

Between 1994 and 1999, Ronald loaned money to Daniel for the farm. The loan included cash and an account receivable for hay Daniel bought from Ronald. There was also a loan to Dale. Ronald kept track of the amounts and calculated interest on them. Initially Daniel signed copies of those accountings. Then, in 2002 and 2009, updated accountings were signed by Daniel, Beverly, Scott, and Dale. Ronald claims he is owed $102,170.59 as of March 14, 2014. He argues this amount was not only a debt of Daniel but, because Scott signed the accounting it became his obligation as well. He also argues that a promise

by Travis to repay the amount as part of their purchase also supports the

obligation of Scott for the loans to Daniel. The accountings did not include any

language constituting a promise to pay. Scott credibly testified that he, Dale,

and Beverly merely signed the accountings to acknowledge the calculations

and not to assume the debt.

The closing was to have included forgiveness of this amount. No closing

occurred and no release or forgiveness of the amount took place.

## LOAN TO SCOTT

In addition to the open account for hay sales and cash advances to

Daniel, Travis says Scott owes him $2,700. This amount was cash to Scott to

hire an attorney to defend against the Webster claims. At the time this loan

was made, Travis maintained the Webster offer was void and had never been

delivered. It occurred when Travis and Scott were first speaking to a lawyer and

Scott was told he would have to hire his own lawyer. Scott admits there was a

loan but says at least some of it was for a different purpose. His testimony

lacked credibility or support.

## DISCUSSION

A discharge of indebtedness in bankruptcy is reserved for the "honest

but unfortunate debtor who surrenders for distribution the property which he

owns at the time of bankruptcy." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54

S. Ct. 695, 78 L. Ed. 1230 (1934); *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.

Ct. 654, 112 L. Ed. 2d 755 (1991). To carry out this "fresh start" policy of

bankruptcy relief, exceptions to discharge are narrowly construed with all

doubts resolved in the debtor's favor. *In re Chambers*, 348 F.3d 650, 654 (7th Cir. 2003); *DeKalb County Div. of Family & Children Servs. v. Platter (In re Platter),* 140 F.3d 676, 680 (7th Cir. 1998); *Miller v. Gentry (In re Miller),* 55 F.3d 1487, 1489 (10th Cir. 1995), *cert. denied*, 516 U.S. 916, 116 S. Ct. 305, 133 L. Ed. 2d 210 (1995). The burden of proof for establishing an exception to discharge is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. at 286-87.

### A. Nondischargeability for False Pretenses, False Representations, and Actual Fraud

Section 523(a)(2)(A) is phrased in the disjunctive, meaning that false pretenses, false representation, and actual fraud are three separate grounds for nondischargeability, and these independent causes of action require proof of different elements. *Aeschliman v. Vraney (In re Vraney),* 2020 WL 1696104, at *8-9, 2020 Bankr. LEXIS 980, at *24-26 (Bankr. N.D. Ill. March 31, 2020). Interpreting that provision of section 523(a)(2)(A) in *Husky Int'l Elecs., Inc. v. Ritz*, the Supreme Court rejected the debtor's argument that the phrase requires a court "to ignore what [was argued to be] Congress' 'imprudent use of the word "or,"' and read the final item in the list to modify and limit the others." *Husky Int'l Elecs., Inc. v. Ritz*, __ U.S. __, 136 S. Ct. 1581, 1590, 194 L. Ed. 2d 655 (2016); *Bank of Cordell v. Sturgeon (In re Sturgeon),* 496 B.R. 215, 222-23 (B.A.P. 10th Cir. 2013); *Ray Klein, Inc. v. Webb (In re Call),* 560 B.R. 814, 821 (Bankr. D. Utah 2016). While the elements for each theory under section 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a

creditor. *Houston v. Munoz (In re Munoz)*, 536 B.R. 879, 884 (Bankr. D. Colo. 2015). False pretenses and actual fraud represent different concepts with somewhat different meanings.

False pretenses under section 523(a)(2)(A) are implied misrepresenttations intended to create and foster a false impression. *Sturgeon*, 496 B.R. at 223. Unlike false representations, which are express misrepresentations, false pretenses include conduct and material omissions. *Id.* "Instead, omissions or a failure to disclose on the part of a debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Landmark Credit Union v. Reichartz (In re Reichartz)*, 529 B.R. 696, 701 (Bankr. E.D. Wis. 2015) (quoting *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 928 (Bankr. N.D. Ill. 1996)). Silence or concealment can also constitute false pretenses. *Fosco v. Fosco (In re Fosco)*, 289 B.R. 78, 86 (Bankr. N.D. Ill. 2002). Material omissions include creation or fostering of false impressions. *William W. Barney, M.D. P.C. Ret. Fund v. Perkins (In re Perkins)*, 298 B.R. 778, 788 (Bankr. D. Utah 2003).

To prove that a debt arose from a false representation, the plaintiff must prove by a preponderance of evidence the traditional, long-standing elements for proving misrepresentation or fraud under the common law of torts. *See Field v. Mans*, 516 U.S. 59, 69 n.9, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). Those elements are:

(1) that the debtor made a false representation;

(2) the representation was made with the intent to deceive the creditor;

(3) the creditor relied on the false representation;

(4) the creditor's reliance was justifiable; and

(5) the creditor was damaged as a result.

*Id.*; *Fowler Bros. v. Young (In re Young)*, 91 F.3d at 1373 (10th Cir. 1996);

*Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009).

And where there is a duty to speak, both concealment and silence can

constitute fraudulent representations. This means:

> When a debtor has an affirmative duty to disclose information, the failure to convey the information may be considered a false representation for purposes of Section 523(a)(2). Moreover, "false pretense[s] as used in § 523(a)(2)(A) includes material omissions, and means 'implied misrepresentations or conduct intended to create and foster a false impression.'" "An overt misrepresentation is not required, because 'omissions or a failure to disclose on the part of the debtor can constitute misrepresentations for the purpose of nondischargeability where the circumstances of the case are such that omissions or failure to disclose create a false impression which is known by the debtor.'" (citations omitted).

*Marks v. Hentges (In re Hentges)*, 373 B.R. 709, 725 (Bankr. N.D. Okla. 2007).

An intent to deceive may be inferred from a "reckless disregard for the

truth or falsity of a statement combined with the sheer magnitude of the

resultant misrepresentation." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta)*,

406 F.3d 367, 372 (5th Cir. 2005).

To the extent "actual fraud" is alleged, such term does not require an

actual misrepresentation on the part of the wrongdoer. *Husky*, 136 S. Ct. at

1587. Before *Husky*, courts used the terms "fraudulent representation" or

"actual fraud" interchangeably. But *Husky* recognized the distinction between

11

the various types of fraud set forth in section 523(a)(2)(A). The Supreme Court

did not define with precision what acts constituted "actual fraud." Rather, it

cryptically noted the term "fraud" has been defined broadly to be "anything that

counts as fraud and is done with wrongful intent" and connotes "deception or

trickery." *Id.* at 1586; *Hatfield v. Thompson (In re Thompson)*, 555 B.R. 1, 11

(B.A.P. 10th Cir. 2016); *Call*, 560 B.R. at 821.

Debtors that intentionally engage in a scheme to deprive or cheat

another of property or a legal right have engaged in actual fraud and are not

entitled to the fresh start provided by the Bankruptcy Code. *Diamond v. Vickery

(In re Vickery)*, 488 B.R. 680, 690 (B.A.P. 10th Cir. 2013).

With the possible exception of reliance, the elements of false pretenses or

false representations are also common to fraud claims. Intentional fraud does

not require reliance, but if the fraud takes the form of a misrepresentation,

reliance is necessary. *CQM, Inc. v. VandenBush (In re VandenBush)*, 614 B.R.

306, 315 (Bankr. E.D. Wis. 2020).

Any of the three types of conduct specified in section 523(a)(2)(A) (false

pretenses, misrepresentation, or actual fraud) have been narrowly construed

by some courts to limit the harsh result of nondischargeability to "frauds

involving moral turpitude or intentional wrong." *DSC National Props., LLC v.

Johnson (In re Johnson)*, 477 B.R. 156, 169 (B.A.P. 10th Cir. 2012). The debtor

must have acted with the subjective intent to deceive the creditor. *First Nat'l

Bank v. Cribbs (In re Cribbs)*, 327 B.R. 668, 674 (B.A.P. 10th Cir. 2005), *aff'd,*

2006 WL 1875366 (10th Cir. 2006); *Holzhueter v. Groth (In re Holzhueter)*, 575 B.R. 444, 453 (Bankr. W.D. Wis. 2017).

Because fraudulent intent is rarely admitted by a debtor, courts uniformly recognize it may be established by circumstantial evidence or by inferences drawn from a course of conduct or from the totality of the circumstances. *United States v. Goodstein*, 883 F.2d 1362, 1370 (7th Cir. 1989); *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (B.A.P. 10th Cir. 2010) (citing *Young*, 91 F.3d at 1375); *Steege v. Johnsson (In re Johnsson)*, 551 B.R. 384, 407 (Bankr. N.D. Ill. 2016). The "totality of the circumstances inquiry is fact specific and hinges on the credibility of witnesses." *Graham v. Graham (In re Graham)*, 600 B.R. 90, 95-96 (Bankr. D. Kan. 2019). Intent may be inferred when the facts and circumstances present a picture of deceptive conduct on the debtor's part. *Manny v. Udelhoven (In re Udelhoven)*, 624 B.R. 629, 648 (Bankr. N.D. Ill. 2021).

Turning now to the credible evidence, the evidence presented at trial persuades this Court that Scott:

- Engaged in a pattern of deceit beginning with the quit claim deed to Otis, followed by the life estates and the negotiations and acceptance of the Webster offer;

- Actively participated in the negotiation and finalization of the offer with Travis and Ronald;

- Was integrally involved in the Webster offer;

- Had a duty to disclose the Webster offer;

- Failed to disclose it and in the typed offer affirmatively represented there was no other accepted offer;

13

- Kept silent at FCS about a prior accepted offer he delivered to Chad Webster permitting payment and release of his obligations on that debt with his parents;

- Was aware of the *lis pendens* and the Webster lawsuit and failed to disclose it. Instead he attended a closing, signed closing documents, and when confronted with the disclosure by the title agent of the Webster *lis pendens*, he joined either by silence or affirmatively in the assertion the Webster offer had never been delivered making it invalid; and

- Participated in continued misrepresentations to Ronald and Travis about the Webster offer.

There were multiple material misrepresentations, omissions, and nondisclosures by Scott. The purpose was to obtain substantial payments from Ronald and Travis to pay off FCS and avoid a foreclosure. This benefited Scott by paying off a debt on which he was liable. It also benefited his parents. This is the type of series of events, "when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor" that constitutes false pretenses. *Call,* 560 B.R. at 821 (citing *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006)).

Scott actively negotiated the Webster offer and did the same with the offer from Ronald and Travis. He maintained silence about the existence of competing offers. He then signed the more formal typed offer from Ronald and Travis and made sure his loan with FCS was paid. He continued the ruse by attending and signing documents at a closing while not once mentioning the Webster offer.

He knew about the dispute with the Websters and of the *lis pendens*.
Even so, he continued to remain silent furthering the impression that Ronald
and Travis were first in time and the sale would close. But for the fact the
closing agent discovered and disclosed the *lis pendens*, it was clear from the
deceitful pattern of conduct demonstrated by Scott that he would not have
mentioned the Webster offer at all. This conclusion was buttressed by the
statements at closing and after that the Webster offer was invalid and Webster
had "stolen" the offer. Scott supported the claims for about ten months that the
Webster offer was never delivered and was invalid. This was a misrepresent-
tation because it was Scott who delivered the offer.

Scott's continued silence constitutes a false representation or omission.
His conduct in aiding in the quit claim for no consideration and similarly
granting life estates demonstrates a pattern of deceit, deceptive conduct, and
disregard for the truth.

Scott made a misrepresentation. It was made with intent to deceive. At
the least, it was made with reckless disregard of the truth in a circumstance
where he should have known it would create a false impression that the Ronald
and Travis offer was the only offer. He knew or should have known of the fraud
or falsity of the representations to Ronald and Travis. *Sullivan v. Glenn*, 782
F.3d 378, 381 (7th Cir. 2015) (quoting *In re Walker*, 726 F.2d 452, 454 (8th Cir.
1984)). The dishonesty and lack of credibility is further supported by the
pattern of deceitful acts to impede the foreclosure—deeds to Williams without

consideration and quit claim deeds to Dale and Scott. He demonstrated a total disregard for the truth.

Ronald and Travis justifiably relied on the representations. The offer to the Websters had not yet closed or been recorded. They had no way to determine there was another offer. The falsity here was not easily detectable. The belief that their offer was first led them to pay $430,000 to FCS without seeking a security interest in the property. Ronald and Travis credibly testified to justifiable reliance on these material misrepresentations and nondisclosures. They credibly testified that no payment would have been made if the truth had been disclosed or, if it had been, that they would have taken steps to secure the payments to assure recovery of the $430,000, interest, and costs and attorneys' fees. Ronald and Travis relied on the representations of Scott in negotiating and signing both the written and then the typed offer and accompanying them to FCS without a mention of the Webster offer. The reliance was justifiable.

Scott's continued representations then led to Travis's loan of $2,700 to him. He needed to hire an attorney to defend against the Webster claims. Travis credibly testified he made the loan to enable Scott to hire a lawyer based on the claims the Webster offer was invalid and had been purloined. But for those misrepresentations, the loan would not have been made. Scott's testimony to the contrary was not credible.

Plaintiffs sustained losses as a proximate result of the material misrepresentations and nondisclosures. Scott benefited from those misrepresentations and nondisclosures.

The Court concludes that the material misrepresentations and nondisclosures found above also fall into the category of "false pretenses" under section 523(a)(2)(A) of the Bankruptcy Code. When considered collectively, Scott's actions created a contrived and misleading understanding that the offer was being complied with—specifically about purchase of the property by Ronald and Travis being possible upon payment to FCS. His continued deceit delayed any resolution or closing on the Webster offer, further causing a detriment to Ronald and Travis and delaying any sale of the property where he and his parents lived without any payment. His conduct and acquiescence in the representations that no offer had ever been delivered to the Websters until almost eleven months after FCS was paid continued the false pretense and misrepresentation. This all ultimately induced Ronald and Travis to pay FCS and to intervene in the Webster litigation to protect what they believed to be a first priority offer.

The Court finds that Scott's conduct and omissions created an overall false impression that induced Ronald and Travis to pay $430,000 to FCS without taking an assignment, without taking any other steps to protect the payment, and to intervene and stay in the state court litigation longer— ultimately causing them harm. *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329, 384 (Bankr. N.D. Tex. 2017).

For these reasons, the Court concludes that the claims of Travis and Ronald against Scott related to the offer and payments to FCS fall within the ambit of section 523(a)(2)(A) of the Bankruptcy Code and are nondischargeable. So too do the claims of Travis against Scott for the $2,700 loan.

### B. Damages and Collateral Estoppel

Ronald and Travis were repaid the sums they paid to FCS. So Scott argues there are no damages. Ronald and Travis counter that the damages are more than simply the amounts paid to FCS. It took 41 months for their payments to FCS to be repaid. During that time, they lost the time value of the money, paid interest on a loan of half that amount, and had other costs and losses flowing from the offer with Beverly, Daniel, and Scott.[3]

The proper measure of damages according to Ronald and Travis is determined under the state law claim for theft-by-fraud. The elements of that claim are:

(1) the defendant made a false representation to the owner of the property;

(2) the defendant knew that the representation was false;

(3) the defendant made the representation with the intent to deceive and defraud the property's owner;

(4) the defendant got title to the property as a result of the false representation;

(5) the owner of the property was deceived by the representation; and the owner of the property was thus defrauded.

---

[3] They also assert other damages related to transactions with Dale. Such amounts are addressed in a separate decision in the adversary proceeding against Dale.

*Malzewski v. Rapkin*, 2006 WI App 183, 296 Wis. 2d 98, 723 N.W.2d 156; Wis. Stat. § 943.20(1)(d).

A party that prevails under this statute may have a right to damages under Wis. Stat. § 895.446(3). If the above elements were demonstrated by a preponderance of the evidence, the debt as it relates to Scott would also meet the state statute elements. Appropriate damages are also nondischargeable.

Scott contends the damages requested by Ronald and Travis are precluded by issue preclusion or collateral estoppel. He says the state court decisions deny Ronald and Travis interest and the time value of the money paid to FCS. This argument fails.

The claims are not precluded. "The doctrine of issue preclusion prevents relitigation of an issue of fact or law previously decided in a judicial proceeding provided the party against whom the prior decision was asserted enjoyed a full and fair opportunity to litigate that issue in the earlier proceeding." *Elbing v. Blair (In re Blair)*, 359 B.R. 233, 237 (Bankr. E.D. Wis. 2007) (citing *Allen v. McCurry*, 449 U.S. 90, 94–95 (1980)). Whether issue preclusion applies is a question determined by state law. *In re Bulic*, 997 F.2d 299, 304 n.6 (7th Cir. 1993).

While Ronald, Travis, and Scott were parties in the state court litigation with the Websters, there was no final determination of the claims or judgment between them. Rather, the claims between them were remanded for further trial. The appeals focused on the priority and enforceability of the Webster offer and its relation to the offer from Travis and Ronald. The claims of Ronald and

19

Travis against Scott are distinct claims. While the claims might have been decided by a state court, that did not occur because of the bankruptcy filing by Scott. *Blair*, 359 B.R. at 237 (citing *Michelle T. v. Crozier,* 173 Wis. 2d 681, 689, 495 N.W.2d 327 (1993)).

The standards applied to judgments when determining preclusion are clear and discernible. The state courts did not make specific findings of fact which would preclude the issue of damages. While Ronald and Travis did obtain some recovery at the closing with the Websters, that did not constitute specific findings of fact that would require this Court to infer dispositive facts about the damages in this adversary. As noted in the Wisconsin Court of Appeals' summary disposition in *Krizan v. Krizan:*

> Based on this record, it appears the Intervening Krizans' misrepresentation and fraud claims asserted in the Third Amended Intervention Complaint have been pending since 2015 and have not yet been litigated. We therefore reverse the order dismissing those claims and remand to the circuit court for further proceedings.[4]

*Krizan v. Krizan*, No. 2018AP916-FT, 3 (Wis. Ct. App. April 30, 2019) (wicourts.gov (unpublished)).

The claims before this Court are for nondischargeability under section 523(a)(2)(A). This section denies discharge if the debt was for money or property "obtained by false pretenses, false representations, or actual fraud." *Gambino v. Koonce*, 757 F.3d 604, 607 (7th Cir. 2014). Although claims were asserted in the state court between Plaintiffs and Defendant, there was no final judgment or trial on those claims. Before any trial or final hearings were held in state

---

[4] Adv. No. 20-16, ECF No. 28, Exh. 10 at 3.

court, Scott filed bankruptcy. So the matter has not been actually litigated.
Because the fraud or misrepresentation claims have not been litigated in the
state court, damages under those claims have likewise not been litigated.

The standards for applying collateral estoppel are also well established.
"Indeed, though the federal courts may look to the common law or to the
policies supporting res judicata and collateral estoppel in assessing the
preclusive effect of decisions of other federal courts, Congress has specifically
required all federal courts to give preclusive effect to state-court judgments
whenever the courts of the State from which the judgments emerged would do
so . . . ." *Allen v. McCurry,* 449 U.S. 90, 96, 101 S. Ct. 411, 66 L. Ed. 2d 308
(1980). Collateral estoppel is inapplicable. There is no judgment on the claims
between Ronald and Travis against Scott, so no review could have been
pursued. The state court proceedings were stayed by Scott's bankruptcy, so
there were no findings or judgment to which the other elements of collateral
estoppel apply.

There is no dispute that Ronald and Travis each paid $215,000 to FCS
on March 28, 2014. The payment satisfied the debt of Scott to FCS. This
payment benefited him. The property was not sold to Ronald or Travis. Instead,
at the time the payment was made to FCS, Scott and others maintained silence
and represented to them that their offer was a first priority offer and acted as if
they would sell to Ronald and Travis. The credible testimony confirmed that
Scott's sole goal was to prevent a foreclosure sale at any cost and by any
means without regard to the facts or truth.

21

Judy Brandner, a title agent, testified that in 2013 Chad Webster had financing, ordered title work, and was ready to close but for resolution of the title issues related to Williams, the Dale and Scott quit claims deeds, and judgments. There was no cooperation from Beverly, Daniel, Scott, or Williams. Title issues created by Scott, his brother, and his parents prevented a closing on the Webster offer. The final cloud on title in the form of the Williams UCC was not released until June 2015. On April 15, 2016, there was finally an order directing closing with the Websters within 30 days. However, that didn't occur for another sixteen months. The tangled title web created by the actions of Scott, his parents, and his brother so clouded title and led to such delays that closing within that time was not possible. Once again, Scott and others achieved the goal of delaying any sale or disposition of the farm and enjoyed the benefit of release from the FCS indebtedness.

The amount of the debt is to be determined under state law. It is determinable and liquidable by an objective standard. As a liquidated debt, Ronald and Travis are entitled to interest at 5% per annum under Wisconsin law.[5] Ronald and Travis were each deprived of the use of $215,000 for 1,249 days—the time elapsed between the payment to FCS and the repayment to them of $430,000 at the closing of the sale to the Websters. At the simple legal

---

[5] Under Wis. Stat. § 138.04, a creditor is entitled to interest upon the "forbearance" of any money due. *See also Klug & Smith Co. v. Sommer*, 83 Wis. 2d 378, 384, 265 N.W.2d 269 (1978); *Wisconsin Alumni Research Found. v. Gen. Elec. Co.*, 880 F. Supp. 1266, 1278 (E.D. Wis. 1995).

rate of 5% on $215,000 for this number of days, Ronald and Travis would each be entitled to interest in the amount of $36,783.05.

Travis also loaned $2,700 to Scott on April 7, 2014. Travis's testimony was credible and consistent that this was a loan for attorneys' fees to enable Scott to hire a lawyer to defend against the Websters' claim that their offer was first. This representation advanced and continued the misrepresentations made by Scott and others. Scott's testimony to the contrary was unbelievable and incredible. The calculation of interest on this to the petition date is a simple calculation—(($2,700 x 5%) ÷ 365) x 2,121 days. He is entitled to $2,700 plus interest in the amount of $784.48. This amount is nondischargeable.

### C. Claim for Loans to Daniel

Ronald asks for judgment against Scott for the principal and interest on the hay and various loans made to Daniel between 1994 and 1999.[6] The assertion that such sums due from Scott are nondischargeable fails.

First, the loans were made to Daniel. Second, the accountings that bear the signature of Scott were created years after the last of the loans or hay deliveries, and those accountings contain no promise to pay. Third, the last of the loans was made more than 20 years before the bankruptcy was filed and the statute of limitations on the claims has passed.

Finally, there is no evidence that hay was delivered or that loans were made based on any representation or omission by Scott. The fact that years after the last hay delivery or cash advance he may have signed a paper

---

[6] Adv. No. 20-15, ECF No. 37, Exh. 12.

containing the mathematic calculation of interest on the value of the hay or the amount of the loans does not in any way provide a scintilla of evidence he made any false representation or any representation with intent to deceive Ronald.

For these reasons, the claims of Ronald against Scott for these amounts are denied and dismissed.

### D. Attorneys' Fees

Plaintiffs may be entitled to attorney fees, but the Court cannot determine any amount based on the record before the Court. The fees must be reasonable in amount and related solely to the misrepresentation claims. If such fees are requested, counsel must submit a detailed request for fees. Any such request is subject to objection and further proceedings.

### CONCLUSION

For the reasons above:

1.     Ronald is entitled to a judgment of nondischargeability against Scott in the amount of $36,783.05.

2.     Travis is entitled to a judgment of nondischargeability against Scott in the amount of $40,267.53.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order and judgment consistent with this decision will be

entered.

Dated:  July 15, 2021

BY THE COURT:

_____

Hon. Catherine J. Furay
U.S. Bankruptcy Judge